UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.,<br><br>                            Debtor,<br>----------------------------------------------------------------X<br>WASHINGTON TOWN CENTER LLC,<br><br>                            Appellant,<br>    -v-<br><br>JERSEY MARKETS OF WASHINGTON TOWNSHIP, LLC,<br><br>                            Appellee. | Case No. 22-CV-4825 (KMK)<br><br>OPINION AND ORDER |

Appearances:

Kenneth L. Baum, Esq.
Law Offices of Kenneth L. Baum LLC
Rochelle Park, NJ
*Counsel for Appellant*

David H. Altman, Esq.
Jeffer, Hopkinson & Vogel
Hawthorne, NJ
*Counsel for Appellee*

KENNETH M. KARAS, District Judge:

       Washington Town Center, LLC ("Appellant" or "Washington") appeals from the May 20, 2022 Order (the "Order") enforcing a 2015 Sales Order from the United States Bankruptcy Court (the "Bankruptcy Court") for the Southern District of New York. (*See generally* Not. of Appeal (Dkt. No. 1).) For the reasons set forth herein, the Court affirms the Order.

I. Background

A. Factual Background

Washington owns a shopping center located at 285 Pascack Road, Township of Washington, New Jersey (the "Property"). (Washington's Appendix ("W.A.") (Dkt. No. 7-1) 249, ¶ A.1.) The Great Atlantic & Pacific Tea Company, Inc. ("A&P") was a tenant at the Property. (*Id*. at 249.) Since 1970, one or more dry cleaning businesses were tenants at the Property. (*Id*. at 330.) In 1999, a Phase I Environmental Site Assessment was conducted at the Property. (*Id*.) According to the ensuing environmental investigation, drycleaning chemical perchloroethylene and its degradation compounds were determined to be present in the soil and groundwater in excess of the applicable legal standards. (*Id*.) The New Jersey Department of Environmental Protection ("NJDEP") was consequently notified by Washington's representative and an environmental remediation case number was assigned. (*Id*.) Based on the foregoing circumstances, Washington has been performing environmental remediation at the Property for years. (*Id*. at 260, ¶ 5.)

On July 19, 2015, A&P and certain of its affiliates (the "Debtors") filed voluntary petitions for relief pursuant to Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York. (*Id*. at 373.) Shortly after filing, A&P sought the potential sale and assignment of its assets, including the lease for the space it occupied at the Property. (*Id*. at 370–418.) On October 13, 2015, the Debtors filed a *Notice of Proposed Transaction with Nicholas Markets, Inc. Pursuant to Discrete Sale and Lease Rationalization Procedures* (the "Sale and Assignment Notice"). (*Id*. at 443–516.) The Sale and Assignment Notice stated that the Debtors' proposed sale of the Lease would be free and clear of all liens, claims, encumbrances and other interests therein and that the Debtors

sought to assume and assign the Lease to Nicholas Markets, Inc. ("Nicholas"). (*Id*. at 444–45.) The Asset Purchase Agreement attached as Exhibit A to the Sale and Assignment Notice defined "Assumed Liabilities" of the Buyer to include, *inter alia*, "all Liabilities arising from and after the Closing Date under the Leases identified on Schedule 3.5(a) and 3.5(b)." (*Id*. at 455.)

On October 6, 2015, Washington filed the *Objection of Washington Town Center LLC to Debtors' Proposed Cure Amount* (the "Cure Objection"), which was docketed at Dkt. No. 1161 in the Bankruptcy Case. (*Id*. at 517–26.) The Cure Objection responded to the Debtors' previously issued notice that the amount necessary to cure in connection with the Lease was $53,874.00. (*Id*. at 518, ¶ 6.) Pursuant to the Cure Objection, Washington asserted that the proper cure amount was $106,124.71, consisting of additional rent for the "Debtors' share of New Jersey real estate taxes, late fees, cleanup charges, and reconciliation of accounts which were due and owing pre-petition." (*Id*. at 518, ¶ 7.)

On October 29, 2015, the bankruptcy court entered its 2015 Sales Order approving the Asset Purchase Agreement between A&P and Jersey Markets. (*Id*. at 527–668.) The 2015 Sales Order, in approving the Asset Purchase Agreement, allowed A&P to:

> sell the Acquired Assets free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights, liabilities, encumbrances and other interests of any kind or nature whatsoever against the Debtors or the Acquired Assets, including, without limitation, any debt arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guarantees, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, employee pension or benefit plan claims, multiemployer benefit plan claims, retiree healthcare or life insurance claims or claims for taxes of or against the Debtors . . . whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether known or unknown and whether imposed by agreement understanding, law, equity or otherwise arising under or out of, in connection with, or in any way related to the Debtors the Debtors' interests in the Acquired Assets, the operation of the Debtors' businesses before the Closing, or the transfer of the Debtors' interests in the Acquired Assets to Buyer (collectively, excluding any liabilities expressly assumed under the Asset Purchase Agreement, the "Claims").

3

(*Id*. at 532–33.)  The 2015 Sales Order provides:

> All Persons having Claims of any kind or nature whatsoever against the Debtors or the Acquired Assets shall be forever barred, estopped and permanently enjoined from pursuing or asserting such Claims against Buyer or any of its assets, property, Affiliates, successors, assigns, or the Acquired Assets.
>
> Buyer would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors and their estates and their creditors, if the sale of the Acquired Assets was not free and clear of all Claims, or if Buyer would, or in the future could, be liable for any such Claims, including, as applicable, certain liabilities related to the operation of stores by the Debtors that will not be assumed by Buyer, as described in the Asset Purchase Agreement.

(*Id*. at 534.)

Pursuant to the Sale and Assignment Approval Order, the Debtors were authorized to transfer the Acquired Assets (as that term was defined in the Asset Purchase Agreement between the Debtors and Nicholas),

> free and clear of all Claims in accordance with section 363(f) of the Bankruptcy Code, with all Claims that represent interests in property to attach to the net proceeds of the Sale Transactions, in the same amount and order of their priority, with the same validity, force and effect which they have against the Acquired Assets, and subject to any claims and defenses the Debtors may possess with respect thereto, in each case immediately before the Closing.

(*Id*. at 539, ¶ 10.)  In addition, pursuant to the Sale and Assignment Approval Order, the Buyer (i.e., Nicholas)

> acknowledges and agrees that from and after the Closing, subject to and in accordance with the Asset Purchase Agreement, it shall comply with the terms of the assumed and assigned Lease in its entirety, including any indemnification obligations expressly contained in such Lease that could arise as a result of events or omissions that occur from and after the Closing, unless any such provisions are not enforceable pursuant to the terms of this Sale Order.

(*Id*. at 543, ¶ 17.)

On November 2, 2015, by way of Assignment and Assumption Agreement and Assignment and Assumption of Lease, Jersey Markets was assigned the interests of A&P as tenant with respect to the lease of the Property. (*Id*. at 91–101.) The Assignment and Assumption Agreement provides, in relevant part:

> Effective as of the Closing, Sellers hereby assign, grant, convey, and transfer Sellers' right, title, and interest in and to the Acquired Assets, including the Lease . . . and Buyer Designee hereby accepts such assignments and assumes and agrees to pay, discharge, or perform when due, the Assumed Liabilities with respect to the Acquired Assets to the extent provided in the Purchase Agreement and to the extent they arise or accrue on or after the Closing Dates.

(*Id*. at 91.) The Assignment and Assumption of Lease of the same date provides similar language:

> Effective as of the Closing, Seller hereby assigns, transfers, conveys and delivers to Buyer all of Sellers' estate, right, title and interest as tenant of the leasehold estate described under the Lease, and Buyer hereby accepts the assignment, transfer, conveyance, and delivery of Seller's estate, rights, title and interest in, to and under such leasehold estate, and assumes and agrees to pay, discharge, and perform when due all of Seller's obligations at tenant under the Lease which arise or accrue on or after Closing.

(*Id*. at 96.)

The subject assigned lease (the "Lease") requires the tenant to pay, among other charges, "Contributions Rent," which, in turn, is defined to include "Impositions Contributions" and "Common Area Contributions." (*Id*. at 132–34.) Pursuant to the Lease, Common Area Contributions include, *inter alia*, the tenant's "Pro Rata Share" of "Common Area Expenses." (*Id*. at 133–34.) Common Area Expenses are defined as "all bona fide expenses incurred to maintain the Shopping Center's common facilities and off–site facilities . . . ." (*Id*. at 134.) Under the terms of the Lease:

> Common Area Expenses include the cost of repairing, repaving, draining, landscaping, cleaning, painting and striping; providing curbing for sidewalks; repairing and maintaining drainage and sewer systems serving the Shopping

5

>   Center; providing insurance for the Common Area and off–site facilities except for a sign structure on which any tenant's business name appears; moving, removing, and treating snow and ice; removing debris; providing and maintaining traffic control and directional signs; depreciating machinery and equipment used in the operation and maintenance of the Common Area; complying with legal requirements including all environmental laws relating to the Common Area and offsite facilities; complying with Landlord's obligations under this Lease with respect to the Common Area and off–site facilities; and any other service customarily performed by landlords with respect to the common areas of similar shopping centers that Landlord performs with respect to this Shopping Center.

(*Id*.)

After Jersey Markets was assigned the Lease, Washington assessed Jersey Markets for the landlord's on-going environmental remediation expense arising from the previous 1970 dry cleaning operations as "common area maintenance." (*Id*. at 16 ¶ 11.)

B.  Procedural History

Jersey Markets filed litigation in Superior Court, Bergen County, New Jersey alleging that Washington improperly sought to collect Jersey Markets' pro rata share of the cost of environmental remediation at the Property and seeking related damages based on breach of contract and related theories. (*Id*. at 16, 266–76.) Washington filed a counterclaim seeking, among other things, the costs it incurred for environmental remediation. (*Id*. at 16–17.) By Order and Decision dated November 18, 2021, the Court in the State Court Action denied both Parties' motions for summary judgment. (*Id*. at 307–08.)

On March 10, 2022, Jersey Markets petitioned the Bankruptcy Court for enforcement of the 2015 Sales Order. (*Id*. at 9–20.) On May 20, 2022, the Bankruptcy Court entered the Order granting Jersey Market's motion. (*Id*. at 669.) The Order held that "that remediation of the Property of environmental contamination which pre-dates the Sale Order and the Closing Date constitutes a liability, obligation, claim or interest,

which arose or accrued prior to the date of the Sale Order and the Closing Date" and that the "Sale Order bars Washington from seeking recompense from Jersey Markets for all costs and expenses of, and relating to, remediation of environmental contamination at the Property for contamination which occurred prior to the Sale Order and the Closing Date." (*Id*. at 671–72.)

Washington filed its Notice of Appeal seeking reversal of the Bankruptcy Court's decision enforcing the 2015 Order on June 9, 2022. (Dkt. No. 1.) On July 6, 2022, Washington filed its designation of the record on appeal. (Dkt. No. 4.) Washington filed its brief on August 5, 2022. (*See* Br. of Appellant in Supp. of Appeal ("Appellant's Br.") (Dkt. No. 7).) Jersey Markets filed its brief on September 2, 2022. (*See* Br. of Appellee in Opp. of Appeal ("Appellee's Br.") (Dkt. No. 9).) Washington filed its Reply brief on September 16, 2022. (*See* Reply Br. of Appellants ("Appellant's Reply") (Dkt. No. 10).)

## II.  Discussion

### A.  Standard of Review

District courts have jurisdiction to review final bankruptcy orders under 28 U.S.C. § 158(a)(1). *See In re DBSD N. Am., Inc.*, 634 F.3d 79, 88 (2d Cir. 2011) (noting that district courts have jurisdiction to "review all final judgments, orders, and decrees of the bankruptcy courts" (quotation marks omitted)). "[A] bankruptcy judge's order is final if it completely resolve[s] all of the issues pertaining to a discrete claim, including issues as to the proper relief." *Pegasus Agency, Inc. v. Grammatikakis (In re Pegasus Agency, Inc.)*, 101 F.3d 882, 885 (2d Cir. 1996) (quotation marks omitted). In addition, the Court has an independent obligation to determine its jurisdiction to hear such an appeal. *See Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011) ("[F]ederal courts have an independent obligation to ensure that they

7

do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press.").

A district court reviews a bankruptcy court's findings of fact for clear error and reviews conclusions of law de novo. *See Lubow Mach. Co. v. Bayshore Wire Prods. Corp. (In re Bayshore Wire Prods. Corp.)*, 209 F.3d 100, 103 (2d Cir. 2000) ("Like the [d]istrict [c]ourt, we review the [b]ankruptcy [c]ourt's findings of fact for clear error, [and] its conclusions of law de novo . . . ." (citation and italics omitted)); *Am. Home Assurance Co. v. Enron Nat. Gas Mktg. Corp. (In re Enron Corp.),* 307 B.R. 372, 378 (S.D.N.Y. 2004) ("A bankruptcy court's conclusions of law are reviewed de novo and its findings of fact for clear error." (italics omitted)). Under the clear error standard, "there is a strong presumption in favor of a [bankruptcy] court's findings of fact if supported by substantial evidence," and a reviewing court will not upset a factual finding "unless [it is] left with the definite and firm conviction that a mistake has been committed." *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1574 (2d Cir. 1994) (alteration and quotation marks omitted). "Where there are two permissible views of the same evidence, the factfinder's choice between them cannot be clearly erroneous." *Id*. at 1574–75; *see also UFCW Local One Pension Fund v. Enivel Props., LLC*, 791 F.3d 369, 372 (2d Cir. 2015) (same).

B.  Analysis

Washington argues that the "[B]ankruptcy [C]ourt's reasoning rested on unsupportable grounds," because "Jersey Markets' obligation to pay its *pro rata* share of Washington's cost of complying with ongoing NJDEP-mandated environmental remediation of the common area at the Property is not based on a claim that the Debtors caused any environmental contamination in

8

the common area, but rather, as part of Washington passing along to its tenants one of the many costs of maintaining that area . . . pursuant to the Lease." (Appellant's Br. 16–17.)

Washington points to the fact that a "claim" is defined under Section 101(5) of the Bankruptcy Code as:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

(*Id*. at 17 (citing 11 U.S.C. § 101(5).)  Washington then notes that the Second Circuit has held, "the existence of a valid bankruptcy claim depends on (1) whether the claimant possessed a right to payment, and (2) whether that right arose before the filing of the petition." (*Id*. (citing *In re Chateaugay Corp.*, 53 F.3d 478, 497 (2d Cir. 1995).)  Washington argues that "[i]n the context of determining whether a claim exists against a debtor relating to pre-petition environmental remediation, however, there is one common element: the debtor had a direct obligation to a non-debtor party to either perform such remediation or pay for the cost of it." (*Id*. at 19 (citations omitted).)  According to Washington, "[t]he Debtors' only obligation to Washington was to pay their various rent obligations under the Lease, including their *pro rata* share of Common Area Expenses," therefore "[t]he Debtors had no direct obligation to anyone to perform environmental remediation of the common area, nor any contractual agreement to indemnify any party for its pre-petition acts." (*Id*. at 20.)  Accordingly, Washington argues that because it "has never had a direct claim against the tenant for environmental remediation of the Property, it did not have a claim against the Debtors' estate that was subject to being excised pursuant to the Sale and Assignment Approval Order." (*Id*. at 17.)

9

The 2015 Sales Order's Bankruptcy Code's definition of "claim" is more expansive than defined under § 101(5) of the Bankruptcy Code, as the term "Claims" is defined as:

> all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights, liabilities, encumbrances and other interests of any kind or nature whatsoever against the Debtors or the Acquired Assets, including, without limitation, any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guarantees, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, employee pension or benefit plan claims, multiemployer benefit plan claims, retiree healthcare or life insurance claims or claims for taxes of or against the Debtors, and any derivative, vicarious, transferee or successor liability claims, rights or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether known or unknown, and whether imposed by agreement, understanding, law, equity or otherwise arising under or out of, in connection with, or in any way related to the Debtors' interests in the Acquired Assets, the operation of the Debtors' businesses before the Closing, or the transfer of the Debtors' interests in the Acquired Assets to Buyer . . . excluding any liabilities expressly assumed under the Asset Purchase Agreement.

(WA 653–54.) Accordingly, whether the environmental remediation constitutes a "claim" under § 101(5) of the Bankruptcy Code appears to be too narrow of a question here. Indeed, the Bankruptcy Court determined that given that the Sale Order approved "the sale of certain of the above-captioned debtors' (the "Debtors") assets, free and clear of liens, claims, interests and encumbrances, pursuant to 11 U.S.C. §§ 363(b) and (f), with all *Claims (as that term is defined in the Sale Order)* to attach to the net proceeds of the transactions referenced therein," the "remediation of the Property of environmental contamination which pre-dates the Sale Order and the Closing Date constitutes a *liability, obligation, claim or interest*, which arose or accrued prior to the date of the Sale Order and the Closing Date." (*Id*. at 669–71 (emphasis added).) Indeed, the Bankruptcy Court did not specifically rule that the environmental remediation constituted a "claim" under

10

§ 101(5) of the Bankruptcy Code.  The Court agrees with the Bankruptcy Court's reading of the plain language of the Sale Order, namely that the "order [] make[s] it clear that any liabilities that existed as of the closing date under the lease were not assumed by the buyer" and that the environmental remediation was a "liability that existed . . . prior to the closing date."  (*Id*. at 701.)  Indeed, the Sales Order clearly allows the Debtors to "sell the Acquired Assets *free and clear of all liens, claims* (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), *rights, liabilities, encumbrances and other interests of any kind or nature whatsoever against the Debtors or the Acquired Assets*."  (*Id*. at 653 (emphasis added).)

Moreover, "as has frequently been observed, [the] definition" of claim under § 101(5) of the Bankruptcy Code "is extremely broad."  *In re Old Mkt. Grp. Holdings Corp*., 647 B.R. 104, 113 (Bankr. S.D.N.Y. 2022), *leave to appeal denied*, No. 20-10161, 2023 WL 2207667 (S.D.N.Y. Feb. 24, 2023) (citing *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991) ("Congress intended . . . to adopt the broadest available definition of 'claim.'")); *see also United States v. LTV Corp. (In re Chateaugay Corp.),* 944 F.2d 997, 1003 (2d Cir. 1991) (Congress gave the term claim a broad definition and "contemplate[d] that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case") (quoting H.R.Rep. No. 95–595, at 309 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6266) (internal quotation marks omitted)).

A claim is "deemed to have arisen pre-petition if the relationship between the debtor and the creditor contained all of the elements necessary to give rise to a legal obligation—a right to payment—under the relevant non-bankruptcy law." *Ogle v. Fid. &*

11

*Deposit Co. of Md.,* 586 F.3d 143, 146 (2d Cir. 2009). "Contract claims arise upon execution of an agreement." *In re Texaco Inc.*, No. 10-CV-8151, 2011 WL 4526538, at *4 (S.D.N.Y. Sept. 28, 2011), *aff'd sub nom. In re Texaco, Inc.*, 505 F. App'x 77 (2d Cir. 2012) (citing *id*. at 146–47 (extending this principle from indemnification agreements to "post-petition costs arising out of pre-petition contracts more generally")). Insofar as Washington argues it now has a right to payment for environmental remediation as a Common Area Expense under the Lease, the Lease between the Debtors and Washington must then, *ipso facto*, have "contained all of the elements necessary to give rise to a legal obligation—a right to payment" for the environmental remediation of which Washington was aware of by 1999. *Ogle,* 586 F.3d at 146; *Conway Hosp., Inc. v. Lehman Bros. Holdings Inc.*, 531 B.R. 339, 342 (S.D.N.Y.2015) ("In interpreting this provision, the Second Circuit Court of Appeals has held that the term 'claim' is sufficiently broad to encompass any possible right to payment.") (quoting *Mazzeo v. United States (In re Mazzeo),* 131 F.3d 295, 302 (2d Cir. 1997)).

Next, Washington argues that the Bankruptcy Court improperly rewrote the terms of the Lease, in violation of the principle of *cum onere*. (Appellant's Br. 22–25.) Specifically, Washington argues that the "[B]ankruptcy [C]ourt, in relying on the Section 363 'free and clear' sale language of the Sale and Assignment Approval Order, improperly vitiated Washington's rights as an assignee of the Lease under Section 365 of the Bankruptcy Code." (Appellant's Reply Mem. 5.) Appellee argues there is no *cum onere* issue here as "it is uncontested that Washington, an interested party to the 2015 Sales Order, and a sophisticated party represented by bankruptcy counsel, knowingly

consented to the asset sale terms and cannot now complain about the impact of the 2015 Sale Order." (Appellee's Mem. 31.)

Section 365(a) of the Bankruptcy Code authorizes a debtor-in-possession to assume or reject, subject to the court's approval, any executory contract or unexpired lease of the debtor. 11 U.S.C. § 365(a). "[Section] 365 obligates the debtor to cure any existing defaults before the debtor can continue to benefit from the contract." *In re George Washington Bridge Bus Station Dev. Venture LLC*, 65 F.4th 43, 47 (2d Cir. 2023). "The law is clear that a debtor who assumes a lease or other executory contract assumes the contract *cum onere,* without any diminution in its obligations or impairment of the rights of the lessor in the present or the future." *In re Texaco Inc.,* 254 B.R. 536, 550 (Bankr. S.D.N.Y. 2000) (citing *N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513, 531 (1984) ("Should the debtor-in-possession elect to assume the executory contract . . . it assumes the contract *cum onere*")); *In re National Gypsum Co.,* 208 F.3d 498, 506 (5th Cir. 2000) ("Where the debtor assumes an executory contract, it must assume the entire contract, *cum onere*—the debtor accepts both the obligations and the benefits of the executory contract."); *In re Kopel,* 232 B.R. 57, 63–64 (Bankr. E.D.N.Y. 1999) ("It is axiomatic that an executory contract generally must be assumed *cum onere.* A debtor cannot simply retain the favorable and excise the burdensome provisions of an agreement."); *In re Jamesway Corp.,* 201 B.R. 73, 76 (Bankr. S.D.N.Y. 1996) ("Except as otherwise provided in the Bankruptcy Code, an executory contract or unexpired lease is assumed *cum onere.*"). "The defaults are cured but the agreement becomes property of the estate in the same shape as it existed prior to bankruptcy, with all of its benefits and burdens." *Matter of Vill. Rathskeller, Inc.,* 147 B.R. 665, 671 (Bankr. S.D.N.Y. 1992).

The Court is unpersuaded that the Bankruptcy Court's Order modified the lease in violation of the doctrine of *cum onere*. The Bankruptcy Court's Order did not bar environmental remediation claims Washington may have that arise under the Lease after 2015 or alter provisions of the Lease. Indeed, the Sales Order did not modify the conditions of the lease, it merely established, as the Bankruptcy Court held, that Appellee "purchased the Debtors' interest in the Lease free and clear of" liabilities, obligations, claims, or interests, which arose prior to the date of the Sale Order and the Closing Date. (W.A. 671.)

In *In re Old Mkt. Grp. Holdings Corp.*, the court held that a lease assumed and assigned to a third party by a debtor pursuant to a sale order's "Free and Clear" provision transferred the lease free and clear of maintenance and repair obligations that arose under the lease prior to the sale. 647 B.R. at 110–12. Accordingly, in response to the landlord's cure objections and the debtors' argument that it had no cure obligations because the landlord could collect payment from the third-party assignee, the court held that the landlord could not compel the third-party assignee to make the repairs, and that the landlord's "recourse is to recover cure costs from the Debtors." *Id*. at 110.

So too here, had Washington wanted to collect for environmental remediation obligations under the Lease that arose prior to the sale, it could have done so by objecting to the cure amount. Following Washington's logic, all free and clear provisions in Sale Orders pertaining to leases would violate *cum onere* if a creditor failed to object to the cure amount. This cannot be.

As the Bankruptcy Court noted:

> based on the record, the landlord was served with notice of the sale. The landlord appeared and objected to the cure costs on a limited basis by filing an objection,

that was resolved, and ultimately was served with notice of the sale and was aware of the sale and the terms of the sale.

(W.A. 700.)  Indeed, the Bankruptcy Court considered that Washington was "well aware" that the contamination existed "back in 1999 or earlier . . . certainly by 2015" and accordingly noted that Washington "certainly could have raised that issue either in the context of a claim against the Debtor, an objection to the cure cost" and that it "could have objected to the sale, the terms of the order" but did not.  (*Id*. at 701.)  Because Washington did not object, this Court, as the Bankruptcy Court did, must "take the [Sales Order] as [it] find[s] it."  (*Id*.); *see In re Lehman Bros. Holdings Inc.*, 526 B.R. 481, 494–95 (S.D.N.Y. 2014) ("Because no party successfully moved for relief under Rule 60, we are bound to apply the Sale Order as written—even if the Bankruptcy Court has reason to regret its pre-approval of the Clarification Letter, and even if it was improper under section 363 of the Bankruptcy Code for the Sale Order to pre-approve the Clarification Letter sight unseen."), *as corrected* (Dec. 29, 2014), *aff'd sub nom. In re Lehman Bros. Holdings, Inc.*, 645 F. App'x 6 (2d Cir. 2016); *see also FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent.").  This Court thus agrees with the Bankruptcy Court that, "tak[ing] the document[s] as [it] find[s]" them, "the sale agreement itself, the assignment and assumption agreements themselves, and the order all make it clear that any liabilities that existed as of the closing date under the lease were not assumed by the buyer."  (W.A. 701.)

15

<u>III.  Conclusion</u>

For the reasons given herein, the judgment of the Bankruptcy Court is affirmed.

The Clerk of the Court is respectfully requested to close this case.

SO ORDERED.

Dated:	September 27, 2023
	White Plains, New York

_____
KENNETH M. KARAS
United States District Judge